**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| TARREN EVANS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 23-3925 (RC) |
| | : | | |
| v. | : | Re Document No.: | 7 |
| | : | | |
| INDIVIDUAL ADVOCACY GROUP, INC., | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

GRANTING DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

In March 2023, Plaintiff Tarren Evans was fired from her job as a Clinical Nursing Director for Defendant Individual Advocacy Group, Inc. ("IAG"). IAG is a nonprofit organization that contracts with the D.C. Department of Disability Services ("DDS") to support adults with disabilities. Evans alleges that she was fired for raising concerns over IAG's practice of inaccurately backdating documents submitted to DDS. In December 2023, Evans sued IAG for damages, alleging (1) retaliation under the False Claims Act's whistleblower provision, 31 U.S.C. § 3730(h); (2) a similar violation of the D.C. False Claims Act, D.C. Code § 2-381.04; and (3) wrongful discharge. IAG has moved to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, IAG's motion to dismiss is granted.

## II.  BACKGROUND

DDS, a D.C. government agency, contracts with IAG to serve the needs of individuals with disabilities.  Amended Compl. ("Compl.") ¶¶ 5, 7, ECF No. 2.[1]  IAG hired Evans as a Clinical Nursing Director in April 2022.  *Id.* ¶ 6.  Her job duties included managing the nursing staff and department, *id.*, as well as "ensur[ing] that necessary documentation is provided to ensure that service authorizations for nursing services . . . are current," "[a]ssisting in the training and promotion of nursing . . . and other staff members," "[e]nsuring that the nursing staff and IAG comply with the federal rules, regulations, and codes," and working "with the Human Resources Coordinator and the IAG corporate office to ensure that licenses are up to date," Def.'s Mot. to Dismiss Ex. A ("Ex. A") at 3, ECF No. 7-1.[2]  In addition to her duties as a Clinical Nursing Director, Evans also had a "full caseload of 10 individuals," which she had to manage along with her compliance and oversight duties.  Compl. ¶ 12.  Her workload was unusual for employees in her position; it was so heavy that she had to work several days unpaid.  *Id.*

In May 2022, Evans was directed to conduct an Individual Service Plan ("ISP") meeting with a supported person before she had received full training on DDS requirements.  *Id.* ¶ 10.  Evans's predecessor was supposed to train her, but failed to do so before resigning in June 2022.

---

[1] To decide this Rule 12(b)(6) motion, the Court "accept[s] all the well-pleaded factual allegations of the complaint as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor."  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1125 n.1 (D.C. Cir. 2015).

[2] IAG attached Evans's signed "Role Description" to its motion to dismiss.  *See* Ex. A.  Because Evans describes her job duties in her Complaint, they are integral to her claim, and she does not contest the authenticity of the Role Description document, the Court will consider it in ruling on IAG's Rule 12(b)(6) motion.  *See Langeman v. Garland*, 88 F.4th 289, 292 (D.C. Cir. 2023).

*Id.* ¶ 11. Around the time Evans's predecessor resigned, Evans "raised her concerns about lack of training to Dr. Nelson," the regional director to whom she reported. *Id.* ¶¶ 8, 13.

Beginning on June 10, 2022, two IAG management officials—Gideon Olatuyi and Martha Nyan—instructed Evans on multiple occasions to "backdate certain training documents" so that "it appeared the training had been completed on an earlier date." *Id.* ¶ 14. Olatuyi and Nyan told Evans that backdating would avoid "residential, medical, or environmental deficiencies with annual contract renewals, individual support plan (ISP) meetings, and trainings being posted on the DDS dashboard." *Id.* Evans raised concerns about this process to Olatuyi, but he told her that if "the real date was not [in] the correct time frame, IAG would get reprimanded for being out of compliance with DDS." *Id.* ¶ 15.

In August 2022, Evans learned that DDS requires new nurses to complete a mandatory training within 14 days of employment. *Id.* ¶ 16. Evans again raised her concerns about her "lack of appropriate training" to Dr. Nelson. *Id.* Presumably, the 14-day deadline would not be an issue for IAG were Evans to backdate her training certification, but that was something Evans apparently refused to do. *See id.* ¶ 18. In September 2022, Evans "adamantly pushed" for IAG to use electronic health records that could be managed in real time, but she was taken aside by Olatuyi and told that "'going live' with online records will never happen in IAG due to the backdating of documents and . . . the risk of getting audited by DDS." *Id.* ¶ 23. From about June 2022 until her termination, Evans felt pressured "to make misrepresentations of facts to obtain Federal health care payments," such as by backdating patient forms that were provided to DDS. *Id.* ¶ 18. "When she refused, she was retaliated against," including by being "ostracized, ignored, deprived of meeting agendas, and excluded from crucial annual . . . meetings," particularly from December 2022 until her firing. *Id.* ¶¶ 18–19. At the end of December, for

example, IAG discontinued her medical insurance coverage without informing her. *Id.* ¶ 25. Evans raised complaints about the hostile work environment to Dr. Nelson and Nyan, but to no avail. *Id.* ¶ 20.

In December 2022, Evans also complained that IAG's "compliance deficiencies with DDS regulations might jeopardize her professional licenses." *Id.* ¶ 21. The next month, her "suspicions of faulty documentation practices" were confirmed at a meeting involving Dr. Nelson and all IAG administrative team members, a guardian of a supported person, and a DDS service coordinator. *Id.* ¶ 24. During that meeting, the "guardian brought up a backdated consent form that was sent to her," which led the DDS coordinator to "scold[] the IAG team for not sending . . . documentation to sign in 'real time,' which was an illegal action." *Id.*

On February 1, 2023, Evans led a CPR training for new hires. *Id.* ¶ 28. During the class, Evans left for about 10 minutes to take an urgent call regarding a DDS supported person, and Olatuyi stepped in for her. *Id.* When she came back, she could tell that Olatuyi had done an inadequate job leading the CPR training. *Id.* On February 3, Evans reported this incident to an employee in Human Resources, "noting her concerns that proper standards were not being adhered to." *Id.* ¶ 29.

That same day, after an orientation training, Evans reminded a nurse that she needed to drop off a supported person's medication. *Id.* ¶ 30. The nurse said she was in a rush to pick up her son, so Evans agreed to drop off the medication for her. *Id.* On February 6, Evans was told that she had been accused of telling the nurse, "I'm gonna smack you," as she was leaving. *Id.* ¶ 31. The next day, Evans was placed on administrative leave, and she was terminated on March 8, 2023. *Id.* ¶¶ 32–33.

In December 2023, Evans filed her Complaint in this case, ECF No. 1, which she amended in March 2024, ECF No. 2. The operative Complaint alleges that she was retaliated against for complaining about IAG's "improper and illegal business practices, including falsification of business records with the purpose of defrauding" DDS. Compl. ¶ 1. The Complaint seeks damages for three causes of action based on (1) a violation of the False Claims Act's whistleblower provision, 31 U.S.C. § 3730(h); (2) a similar violation of the D.C. False Claims Act, D.C. Code § 2-381.04; and (3) wrongful discharge. Compl. ¶¶ 34–51.

IAG moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6). Def.'s Mot. to Dismiss ("MTD"), ECF No. 7. The motion is now fully briefed and ready for this Court's consideration.

### III.  LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In addition to the complaint, "[a] court may also consider documents attached to a motion to dismiss if they are 'referred to in the complaint,' integral to the claim(s), and if their authenticity is undisputed." *Langeman v. Garland*, 88 F.4th 289, 292 (D.C. Cir. 2023) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). And courts need not accept as true conclusory

5

allegations or legal conclusions.  *Iqbal*, 556 U.S. at 678, 681.  Instead, courts must draw upon their "judicial experience and common sense" to determine whether the "well-pleaded facts" support a plausible claim.  *Id.* at 679.

## IV.  ANALYSIS

The Court first analyzes Evans's retaliation claims under the federal and D.C. False Claims Acts together, as the parties agree that the same legal standards apply.  *See* MTD at 4–5; Pl.'s Mem. Law Opp'n ("Pl.'s Opp'n") at 12, ECF No. 10; *Craig v. Not for Profit Hosp. Corp.*, 626 F. Supp. 3d 87, 101–02 (D.D.C. 2022) (considering claims brought under the two Acts together because "[t]here is no material difference between the two Acts' anti-retaliation provisions").  The Court then analyzes Evans's wrongful discharge claim.  Because the Court concludes Evans failed to state a plausible claim to relief, the Court lastly addresses Evans's request for leave to amend her Complaint.

### A.  False Claims Act

The False Claims Act "imposes civil penalties and treble damages upon any person who, among other things, 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' to the federal government, or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]'"  *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019) (alteration in original) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)).  The whistleblower provision of the Act states:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

6

31 U.S.C. § 3730(h)(1).[3]  To state a claim under § 3730(h), "a plaintiff must plead facts showing (i) that she engaged in protected activity, (ii) 'because of' which she was retaliated against." *Singletary*, 939 F.3d at 293 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).  The Court addresses these two requirements in turn.

### 1. Engaged in Protected Activity

"Protected activity under the False Claims Act's anti-retaliation provision takes two forms." *Id.* at 295.  The first is reactive to a suspected violation, while the second is preventative of a future violation.  *Id.* at 296.  Under the first prong, "an employee's lawful acts are in 'furtherance of an action under this section' if she 'investigat[es] matters that reasonably could lead to,' or have a 'distinct possibility' of leading to, a 'viable False Claims Act case.'" *Id.* at 295 (alteration in original) (quoting *Hoyte v. American Nat'l Red Cross*, 518 F.3d 61, 66, 68–69 (D.C. Cir. 2008)).  Neither dissatisfaction with treatment at work nor an investigation of nothing more than an employer's compliance with regulations is enough.  *Id.*  Rather, "'the plaintiff's investigation must concern "false or fraudulent" claims' submitted for federal funding." *Id.* (quoting *Yesudian*, 153 F.3d at 740).  Under the second prong, a plaintiff can establish that she engaged in protected activity "if she plausibly alleges facts showing that she took lawful measures to stop or avert what she reasonably believed would be a violation of the False Claims Act." *Id.* at 297.

---

[3] The D.C. False Claims Act whistleblower provision similarly states:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under this subchapter or other efforts to stop one or more violations of this subchapter.

D.C. Code § 2-381.04(a).

7

IAG argues that "Plaintiff's Complaint is devoid of any factual allegations she was investigating false or fraudulent claims for payment by the Federal or D.C. government." MTD at 7. The Court agrees. In response, Plaintiff cites to portions of her Complaint in which she raised concerns about deficient training, was instructed to backdate documents, and complained about compliance jeopardizing her licensure. *See* Pl.'s Opp'n at 15–16. But none of these allegations establish what investigative steps Evans took beyond voicing her concerns. Thus, the Court proceeds to address whether Evans engaged in protected activity under the second prong.

To constitute protected activity under the second prong, the employee's conduct must pertain to her "objectively reasonable belief that the employer is violating, or will violate, the False Claims Act." *Singletary*, 939 F.3d at 296. Though "mere refusal to participate in an allegedly fraudulent scheme" is not enough, *see United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 135 (D.D.C. 2014), refusal to engage in a fraudulent scheme can be sufficient where the refusal is "intended and reasonably could be expected to prevent the submission of a false claim to the government," *see United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 96 (2d Cir. 2017).

Take, for example, the plaintiff in *Singletary*. There, the plaintiff alleged retaliation by Howard University related to violations of National Institutes of Health ("NIH") standards, which were tied to some of the University's grants. *Singletary*, 939 F.3d at 293–94. The plaintiff repeatedly warned University officials that laboratory animals were being kept in impermissibly hot quarters, in violation of NIH standards. *Id.* After many mice died from heat exhaustion, she emailed the NIH to report the violation, copying her supervisors. *Id.* at 294. The D.C. Circuit held that she had alleged protected activity to stop or avert a violation of the False Claims Act, reasoning that she repeatedly informed her supervisor that the laboratory conditions

8

were not in compliance with NIH standards—on which the University's grant money was conditioned—and that she had an objectively reasonable belief that the University would submit a false certification of compliance to the NIH based on the University's annual certification requirements. *Id.* at 297–98.

Here, Evans alleges that she repeatedly raised concerns about backdating to her supervisors and IAG management officials, and that she herself refused to backdate documents. Compl. ¶¶ 15, 18, 23. She further alleges that she was instructed to backdate documents—that is, to misrepresent the date—to maintain compliance with DDS regulations and "to obtain Federal health care payments." *Id.* ¶¶ 14–15, 18. Whereas the fraudulent claim in *Singletary* involved the inaccurate annual certification of compliance, here, the alleged fraud was even more widespread, implicating several categories of documents required by DDS, such as patient consent forms, ISP documents, and mandatory training forms. *See* Compl. ¶¶ 14, 18. Accepting the Complaint's allegations as true, and drawing reasonable inferences in Evans's favor, the Complaint sufficiently alleges the Evans engaged in protected activity by refusing to backdate forms submitted to DDS and by attempting to get others at IAG to do the same.

IAG's arguments to the contrary are unconvincing. IAG faults Evans for not providing factual allegations regarding any false or fraudulent claims to the government. *See* MTD at 6. But reading the Complaint as a whole, Evans did not need to identify specific fraudulent claims because she alleges that IAG's standard practice was to postdate documents to maintain DDS compliance. *See, e.g.*, Compl. ¶¶ 15, 23. IAG also argues that "Plaintiff's concerns with backdating documents pertained to IAG's alleged non-compliance with DDS regulations and requirements, including the impact it might have on her licensure." MTD at 9; *see* Def.'s Reply Br. ("Def.'s Reply") at 5, 7, ECF No. 11. True, but the Complaint also alleges that the

"falsification of business records" was for "the purpose of defrauding" DDS, Compl. ¶ 1, and that IAG management officials pressured Evans to backdate documents "to obtain Federal health care payments," *id.* ¶ 18. Though the Court agrees that Evans could have more clearly connected the dots between DDS regulation compliance and funding, and the Court encourages her to do so when amending her Complaint, the Court can reasonably infer that connection from the face of the Complaint. *See* Pl.'s Opp'n at 15–16. Thus, the Court is satisfied that Evans has plausibly alleged that she engaged in protected activity under the False Claims Act.

2. Retaliatory Motivation

Having established that she engaged in protected activity, Evans must also establish "(i) a qualifying retaliatory employment action, (ii) [IAG's] knowledge that she was engaged in protected activity, and (iii) facts showing that the employment action was caused," at least in part, "by her engagement in that activity." *Singletary*, 939 F.3d at 293, 299. "Discharge plainly qualifies as a retaliatory employment action under Section 3730(h)," *id.* at 299, and IAG moves to dismiss based on its lack of notice of the engaged protected activity, without reaching the third element of causation,[4] MTD at 10–12. Thus, the dispositive issue is IAG's notice of Evans's protected activity.

That means Evans must allege that IAG was aware that she engaged in lawful acts aimed at preventing IAG's submission of false or fraudulent claims. *See Singletary*, 939 F.3d at 300. Importantly, however, "plaintiffs alleging that performance of their normal job responsibilities

---

[4] IAG argues that "motive" is not at issue in its motion to dismiss. Def.'s Reply at 2 n.1. In doing so, IAG appears to misunderstand the significance of notice to the Court's analysis. "Common sense teaches that an employer cannot retaliate against conduct of which it was unaware." *Singletary*, 939 F.3d at 300. Accordingly, an employer's lack of notice of protected activity defeats an argument that the employer acted "because of" the plaintiff's protected activity. *See id.* Because IAG disputes notice, its motive is at issue.

constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)). But "when an employee acts outside h[er] normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity," and thus overcome the *Martin-Baker* presumption. *See id.*

Here, Evans fails to establish IAG's notice of her protected activity because her complaints to IAG regarding backdating were within the scope of her job duties. As mentioned, Evans does not contest that those duties included "ensur[ing] that necessary documentation is provided to ensure that service authorizations for nursing services . . . are current," "[a]ssisting in the training and promotion of nursing, DSP, and other staff members," "[e]nsuring that the nursing staff and IAG comply with the federal rules, regulations, and codes," and working "with the Human Resources Coordinator and the IAG corporate office to ensure that licenses are up to date." Ex. A at 3. Evans challenges the applicability of the *Martin-Baker* presumption because her "core duties" were "not exclusively or even principally about 'ensur[ing] compliance.'" Pl.'s Opp'n at 19 (quoting *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 19 (D.D.C. 2015)). But Evans alleges that her duties included "maintaining compliance of various mandatory training[s] for the organization." Compl. ¶ 12. Moreover, to accept Evans's reasoning would seemingly limit the presumption to compliance officials. Evans cites no authority for such a limitation; even the court in *Pitts*, on which Evans relies, assumed without deciding that the presumption applied. *See Pitts*, 111 F. Supp. 3d at 19–20. Because "training, completion of necessary paperwork, assurance that necessary documentation for nursing services is current, and compliance with

11

rules, regulations and codes were all within Plaintiff's regular job responsibilities," MTD at 11, the Court agrees that Evans had to do something beyond her duties to put IAG on notice of her protected activity, *see United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239 (D.C. Cir. 2012) (reasoning that because government contract compliance was part of plaintiff's job, her retaliation claim could not succeed unless she acted outside her normal job responsibilities, notified someone outside her usual chain of command, advised her employer to hire counsel, or otherwise put her employer on notice that litigation was a reasonable possibility).

  Evans has not met this burden. Her Complaint does not allege that she went beyond the scope of her job duties in voicing her concerns about backdating. For example, to argue she raised her concerns beyond the usual chain of command, Evans states that she contacted Human Resources. Pl.'s Opp'n at 20. But she supports that assertion with citations to a declaration attached to her opposition brief, not allegations included in her Complaint. *See id.* And to support that she "clearly complained about IAG conduct being fraudulent or potentially subjecting IAG to FCA liability," she cites to paragraphs 15, 18, and 21 of her Complaint. *Id.* None of those paragraphs mention FCA liability, and only paragraph 18 includes facts implicating fraud, but does so in the context of what she felt pressured to do, not what she told IAG. *See* Compl. ¶¶ 15, 18, 21. Evans does not even allege that she told IAG why she refused to backdate documents. *See id.* ¶ 18.

  What is more, Evans's Complaint alleges that a January 2023 meeting with a DDS coordinator confirmed her suspicion that backdating was illegal. *See id.* ¶ 24. But the Complaint provides no factual allegations regarding what Evans did with this information, which seemingly would have emboldened her to take action, such as "advising [IAG] to hire counsel," *see Schweizer*, 677 F.3d at 1239, submitting whistleblower reports to IAG officials, *see United*

*States ex rel. Kini v. Tata Consultancy Servs., Ltd.*, 146 F.4th 1184, 1196 (D.C. Cir. 2025), or sending an email to DDS, *see Singletary*, 939 F.3d at 301.  Absent factual allegations that Evans went beyond her normal job duties in expressing concerns about backdating, the Court is unable to conclude IAG had notice of her protected activity.  Consequently, the Court concludes that Evans has failed to state a claim under the federal and D.C. False Claims Acts.

### B. Wrongful Discharge

"[T]he District of Columbia Court of Appeals [has] recognized a 'very narrow' public policy exception to the at-will employment doctrine: 'a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation.'" *Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 254 (D.C. Cir. 2008) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991)).  Such exceptions should be recognized "only if they reflect a clear mandate of public policy officially declared in a statute or regulation, or in the Constitution, and demonstrate a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Williams v. Chugach Alaska Corp.*, 210 F. Supp. 3d 25, 31 (D.D.C. 2016) (citation modified) (quoting *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F.Supp.3d 241, 249 (D.D.C. 2015)).  But in doing so, a plaintiff "must also show that this policy is not already protected by another statute." *See Brown v. Howard Univ. Hosp.*, No. 19-cv-3340, 2021 WL 311001, at *3 (D.D.C. Jan. 29, 2021).

Evans's Complaint alleges "a clear mandate of public policy in favor of allowing employees to report to management health or safety issues, to complain about acts of retaliation for having done so, and to complain of fraudulent activities of the employer." Compl. ¶ 47.  She grounds this mandate in the Department on Disability Services Establishment Act, the

13

Rehabilitation Services Program Establishment Act, and the D.C. False Claims Act. *Id.* IAG moved to dismiss this claim on all three bases. MTD at 13. In response, Evans did not address IAG's arguments regarding the Rehabilitation Services Program Establishment Act or the D.C. False Claims Act, so the Court considers those arguments conceded. *See Liu v. Georgetown Univ.*, No. 22-cv-157, 2024 WL 4362128, at *5 (D.D.C. Sept. 30, 2024) ("Further, if a plaintiff 'files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'" (quoting *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 268 F. Supp. 3d 61, 72 (D.D.C. 2017))).

Having narrowed the issue, Evans's remaining basis does not fare much better. She relies on the Department of Disability Services Establishment Act, specifically D.C. Code § 7-761.03(3) and § 7-761.13(a)(1)(H), and identifies her reporting of "the CPR class incident" as the protected reporting of "health and safety issues." *See* Pl.'s Opp'n at 21. Neither of these provisions supports Evans's claim.

First, § 7-761.03(3) provides that "the Department on Disability Services is established as a separate Cabinet-level agency, subordinate to the Mayor, within the executive branch of the District of Columbia, for the purpose of . . . [p]romoting the well-being of individuals with intellectual or developmental disabilities throughout their life spans, through the delivery of individualized, high-quality, safe services and supports." This is a general statement of purpose for the creation of DDS. Thus, Evans's claims, particularly those related to a deficient CPR training, are not "solidly" and "close[ly]" based on that general statute. *See Williams*, 210 F. Supp. 3d at 31 (quoting *Leyden*, 83 F. Supp. 3d at 249).

Second, § 7-761.13(a)(1)(H) provides that "[t]he Department shall . . . [e]stablish a process for the resolution of formal complaints, including formal complaints filed with a provider, which shall include, at a minimum . . . [p]rohibitions on retaliatory actions such as reprisal, restraint, interference, coercion, or discrimination by DDS or a provider against a person who files a formal complaint."  A "formal complaint" is defined in the statute as a "statement by a person of his or her dissatisfaction with DDS or a provider, including the denial of any services and supports under this chapter or other applicable law."  D.C. Code § 7-761.02(5B)(A).  Thus, the Court agrees with IAG that this section "provides that DDS must establish a process to resolve 'formal complaints,' including 'formal complaints' filed with a provider, and sets forth minimum provisions which must be included in DDS'[s] complaint resolution process."  Def.'s Reply at 12.  To the extent this provision reflects a policy in favor of raising complaints against providers, because it "create[es] a specific, statutory cause of action to enforce" that policy through a complaint resolution process, the provision cannot form the basis of a wrongful termination claim.  *See Carter v. District of Columbia*, 980 A.2d 1217, 1226 (D.C. 2009); *Brown*, 2021 WL 311001, at *3.  Because neither provision supports Evans's wrongful discharge claim, the Court will also grant IAG's motion to dismiss this claim.

### C.  Leave to Amend

Under Rule 15(a), a "court should freely give leave" to amend a complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  "The key issue in considering a motion to amend is whether the non-movant will suffer any prejudice from the amendment."  *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 79 (D.D.C. 2009) (quoting *Clark v. Feder Semo & Bard, PC*, 560 F. Supp. 2d 1, 3 (D.D.C. 2008)).  In Evans's opposition brief, she requested that if the Court grants IAG's motion to dismiss, she

be granted leave to amend. Pl.'s Opp'n at 22. IAG argues that the Court should deny this request because "Plaintiff has failed to specify the grounds for her purported amendment." Def.'s Reply at 13. But, as IAG acknowledged, Plaintiff's opposition brief and attached declaration include "allegations [that] are not set forth in Plaintiff's Complaint." *See id.* at 4. Though Evans could not amend her Complaint in her opposition brief, *see Valibeigi v. District of Columbia*, No. 22-cv-3149, 2024 WL 4332626, at *5 n.8 (D.D.C. Sept. 27, 2024), the Court is not certain that amendment would be futile, *see In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (affirming the district court's denial of leave to amend the complaint based on futility of amendment). Further, IAG does not argue that it will be prejudiced by amendment at this early stage of the litigation. *See Driscoll v. George Wash. Univ.*, 42 F. Supp. 3d 52, 57 (D.D.C. 2012) (finding no prejudice from amendment at the pleading stage); *Ellis*, 631 F. Supp. 2d at 80 (finding no undue prejudice from amendment "prior to the commencement of briefing on summary judgment"). Accordingly, the Court will grant IAG's motion without prejudice, and grant Evans leave to amend her Complaint to address the deficiencies identified in this Memorandum Opinion.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 7) is **GRANTED** without prejudice. The Court will grant Plaintiff leave to amend her Complaint on or before October 16, 2025. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 16, 2025                                              RUDOLPH CONTRERAS
                                                                        United States District Judge