**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| TARREN EVANS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 23-3925 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 15, 18 |
| | : | | |
| INDIVIDUAL ADVOCACY GROUP, INC., | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**DENYING DEFENDANT'S MOTION TO DISMISS**

**I.  INTRODUCTION**

In March 2023, Plaintiff Tarren Evans was fired from her job as a Clinical Nursing Director for Defendant Individual Advocacy Group, Inc. ("IAG").  IAG is a nonprofit organization that contracts with the D.C. Department of Disability Services ("DDS") to support adults with disabilities.  Evans alleges that she was fired for raising concerns over IAG's practice of inaccurately backdating documents submitted to DDS.  In December 2023, Evans sued IAG for damages, alleging (1) retaliation under the federal False Claims Act's whistleblower provision, 31 U.S.C. § 3730(h); (2) a similar violation of the D.C. False Claims Act, D.C. Code § 2-381.04; and (3) wrongful discharge.  In October 2024, IAG moved to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6).  In September 2025, the Court granted that motion but allowed Evans to amend her Complaint.  She has done so, and IAG has again moved to dismiss under Rule 12(b)(6).  For the reasons stated below, the Court concludes that Evans has stated a claim under both False Claims Acts and will accordingly deny IAG's motion to dismiss.

## II.  BACKGROUND

Because this is the Court's second opinion in this case, the Court assumes the parties'

familiarity with the factual and procedural background.  The Court nevertheless restates that

background to account for Evans's amendments to her operative Complaint.

DDS, a D.C. government agency, contracts with IAG to serve the needs of individuals

with disabilities.  Second Am. Compl. ("SAC") ¶¶ 5, 7, ECF No. 14.[1]  IAG hired Evans as a

Clinical Nursing Director in April 2022.  *Id.* ¶ 6.  Her job duties included "oversight of IAG's

nursing staff and overall nursing operations."  *Id.*  In addition to her duties as a Clinical Nursing

Director, Evans managed a "full caseload of 10 individuals."  *Id.* ¶ 12.  Her workload was

unusually heavy for employees in her position and required her to work several days unpaid.  *Id.*

¶ 13.

In May 2022, Evans was directed to conduct an Individual Service Plan ("ISP") meeting

with a supported person before she had received full training on DDS requirements.  *Id.* ¶ 10.

Evans's predecessor was supposed to train her but failed to do so before resigning in June 2022.

*Id.* ¶ 11.  Around the time Evans's predecessor resigned, Evans "raised her concerns about the

lack of training to" Dr. Casey Nelson, the regional director to whom she reported.  *Id.* ¶¶ 8, 14.

Beginning on June 10, 2022, two IAG management officials—Gideon Olatuyi and

Martha Nyan—instructed Evans on multiple occasions to "backdate certain training documents[]

so that it appeared the training had been completed on an earlier date."  *Id.* ¶ 15.  Olatuyi and

Nyan told Evans that backdating would "avoid residential, medical, or environmental

---

[1] To decide this Rule 12(b)(6) motion, the Court "accept[s] all the well-pleaded factual allegations of the complaint as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor."  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1125 n.1 (D.C. Cir. 2015).

deficiencies with annual contract renewals, individual support plan (ISP) meetings, and trainings being posted on the DDS dashboard." *Id.* Evans raised concerns and questions about this process to a house manager and Olatuyi, but Olatuyi told Evans that if "the real date and time stamp was out of compliance, IAG would get reprimanded for being out of compliance with DDS." *Id.* ¶ 16. Olatuyi, who trained Evans "and was also the liaison for compliance for the organization's DC region, confirmed to [Evans] that this alteration was okay within regulations of DDS." *Id.*

In August 2022, a DDS nurse auditor, Benjamin Guilluame, informed Evans that DDS requires new nurses to complete a mandatory training within fourteen days of employment. *Id.* ¶ 17. Evans again raised her concerns about her "lack of appropriate training" to Dr. Nelson. *Id.* The next month, Evans "insisted that IAG start utilizing [its] electronic health records" that could be managed in real time, but she was taken aside by Olatuyi and told that "'going live' with online records will never happen within IAG due to the backdating of documents and . . . the risk of getting audited by DDS." *Id.* ¶ 24.

From about June 2022 until her termination, Evans felt pressured "to make misrepresentations of facts to obtain Federal health care payments," such as by backdating patient forms that were provided to DDS. *Id.* ¶ 19. When she refused, "she was retaliated against," including by being "excluded from crucial meetings and deprived of information needed to fulfill her job duties." *Id.* Additionally, at the end of 2022, IAG discontinued her medical insurance coverage without informing her. *Id.* ¶ 28. Evans raised complaints about the hostile work environment to Dr. Nelson and Nyan, but to no avail. *Id.* ¶ 25.

In December 2022, Evans complained to Dr. Nelson and Nyan that IAG's "compliance deficiencies with DDS regulations might jeopardize her professional licenses." *Id.* Specifically,

3

Evans alleges that she "told Ms. Nyan that IAG was not in compliance with terms and conditions under which it was receiving federal funds from DDS contracts, and ultimately receiving funds from Medicare and Medicaid." *Id.* ¶ 27. Around that same time, Evans raised her concerns about compliance and backdating to Sheri Satcher, the Human Resources coordinator. *See id.* ¶¶ 25–26. Evans alleges that she viewed this action as an escalation because "she was going over Mr. Olatuyi and Ms. Nyan." *Id.* ¶ 26. Evans even alleges that she raised her concerns about backdating directly "to the DDS nurse." *Id.* ¶ 27.

On January 20, 2023, Evans's "suspicions of faulty documentation practices were confirmed" at a meeting involving Dr. Nelson and all IAG administrative team members, a guardian of a supported person, and a DDS service coordinator. *Id.* ¶ 29. During that meeting, the "guardian brought up a backdated consent form that was sent to her," which led the DDS coordinator to "scold[] the IAG team for not sending . . . documentation to sign in 'real time,' which was an illegal action." *Id.* After this meeting, Evans again raised her concerns with faulty documentation practices to Satcher from Human Resources "in hope[s] that she [could] arrange a meeting with Dr. Nelson, and the Executive Director, Dr. Charlene Bennett." *Id.* On January 23, 2023, Evans contacted Dr. Nelson to raise her concerns regarding recordkeeping, as well as other management issues. *See id.* ¶ 31. Dr. Nelson said that some of Evans's requests required Executive Director Bennett's approval, but Dr. Nelson failed to contact Dr. Bennett as he assured Evans that he would. *See id.*

On February 1, 2023, Evans led a CPR training for new hires. *Id.* ¶ 32. During the class, Evans left for about 10 minutes to take an urgent call regarding a DDS supported person, and Olatuyi stepped in for her. *Id.* When Evans came back, she could tell that Olatuyi had done an inadequate job leading the CPR training. *Id.* On February 3, Evans reported this incident to

Satcher in Human Resources, "noting her concerns that proper standards were not being adhered to not only with regards to backdating, but also actual medical trainings." *Id.* ¶ 34. "She insisted she wanted Ms. Satcher to arrange a meeting with Dr. Bennett to discuss all the issues from backdating to faulty CPR trainings." *Id.*

That same day, Evans reminded a nurse, Comfort Sema, that she needed to drop off a supported person's medication. *Id.* ¶ 35. Sema said she was in a rush to pick up her son, so Evans agreed to drop off the medication for her. *Id.*

On February 6, Evans was called in for a meeting with Dr. Nelson and Nyan, which she assumed would "focus on her complaint regarding backdating and faulty CPR trainings." *Id.* ¶ 36. Instead, Evans was told that she had been accused of telling Sema, "I'm gonna smack you," as she was leaving. *Id.* ¶ 36. "After the meeting, Plaintiff attempted to contact Dr. Bennett." *Id.* The next day, Evans was placed on administrative leave, and she was terminated on March 8, 2023. *Id.* ¶¶ 37–38.

In December 2023, Evans filed her Complaint in this case, ECF No. 1, which she amended in March 2024, ECF No. 2. Her Amended Complaint alleged that she was retaliated against for complaining about IAG's "improper and illegal business practices, including falsification of business records with the purpose of defrauding" DDS. Am. Compl. ¶ 1, ECF No. 2. The Complaint sought damages for three causes of action based on (1) a violation of the False Claims Act's whistleblower provision, 31 U.S.C. § 3730(h); (2) a similar violation of the D.C. False Claims Act, D.C. Code § 2-381.04; and (3) wrongful discharge. *Id.* ¶¶ 34–51.

In October 2024, IAG moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6). Def.'s Mot. to Dismiss, ECF No. 7. In ruling on that motion, the Court first concluded that the Complaint sufficiently alleged that "Evans engaged in protected activity by

refusing to backdate forms submitted to DDS and by attempting to get others at IAG to do the same." Mem. Op. at 9, ECF No. 13. But the Court dismissed Evans's False Claims Act claims "because her complaints to IAG regarding backdating were within the scope of her job duties," meaning she failed to plead IAG's notice of her protected activity. *Id.* at 11. The Court also dismissed her wrongful discharge claim. *See id.* at 13–15. Lastly, the Court granted Evans leave to amend her Complaint, *id.* at 15–16, which she has now done, *see* SAC, ECF No. 14.

Evans's operative Complaint maintains the same general theory of her case, but brings only two counts, under the federal False Claims Act and D.C. False Claims Act. *See* SAC ¶¶ 40–51. IAG has again moved to dismiss the Complaint. *See* Def.'s Mot. to Dismiss SAC ("MTD"), ECF No. 15. Evans has filed a brief in opposition, Pl.'s Opp'n, ECF No. 17, as well as a motion for discovery under Rule 56(d), ECF No. 18. The motions are fully briefed and ready for this Court's consideration.

### III.  LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). But courts need not accept as true conclusory allegations or legal conclusions. *Iqbal*, 556 U.S. at 678, 681. Instead,

6

courts must draw upon their "judicial experience and common sense" to determine whether the "well-pleaded facts" support a plausible claim. *Id.* at 679.

### IV. ANALYSIS

The Court again analyzes Evans's retaliation claims under the federal and D.C. False Claims Acts together, as the parties agree that the same legal standards apply. *See* MTD at 6; Pl.'s Opp'n at 13; *Craig v. Not for Profit Hosp. Corp.*, 626 F. Supp. 3d 87, 101–02 (D.D.C. 2022) (considering claims brought under the two Acts together because "[t]here is no material difference between the two Acts' anti-retaliation provisions"). The False Claims Act "imposes civil penalties and treble damages upon any person who, among other things, 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' to the federal government, or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]'" *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019) (alteration in original) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)). The whistleblower provision of the Act states:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).[2] To state a claim under § 3730(h), "a plaintiff must plead facts showing (i) that she engaged in protected activity, (ii) 'because of' which she was retaliated against."

---

[2] The D.C. False Claims Act whistleblower provision similarly states:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated

Singletary*, 939 F.3d at 293 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).

"Based on this Court's [prior] Memorandum opinion, IAG assumes for purposes of this Motion only that Plaintiff has adequately plead[ed] that she engaged in statutorily protected activity." MTD at 6. Therefore, the Court's analysis focuses only on retaliatory motive.

To establish retaliatory motive, Evans must plead "(i) a qualifying retaliatory employment action, (ii) [IAG's] knowledge that she was engaged in protected activity, and (iii) facts showing that the employment action was caused," at least in part, "by her engagement in that activity." *See Singletary*, 939 F.3d at 293, 299. "Discharge plainly qualifies as a retaliatory employment action under Section 3730(h)," *id.* at 299, and IAG moves to dismiss based only on its lack of notice of protected activity, without making any argument regarding the third element, causation, MTD at 7–14. Thus, the dispositive issue is once again IAG's notice of Evans's protected activity.

As the Court previously explained, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003)). But "when an employee acts outside h[er] normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity," and thus overcome the *Martin-Baker* presumption. *See id.* In

others in furtherance of an action under this subchapter or other efforts to stop one or more violations of this subchapter.

D.C. Code § 2-381.04(a).

8

this way, even an employee responsible for compliance can put her employer on notice by taking any action from which the employer becomes aware that False Claims Act litigation is a reasonable possibility. *See United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239 (D.C. Cir. 2012). The parties dispute the applicability of the *Martin-Baker* presumption here. *See* MTD at 7–11; Pl.'s Opp'n at 14–16.

But the Court need not resolve that dispute because, even assuming the presumption applies, Evans's operative Complaint alleges that she went beyond her normal job duties and alerted parties outside her usual chain of command when she raised her concerns about backdating.[3] *See Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 19–20 (D.D.C. 2015) (holding that employer had adequate notice of protected activity "[e]ven if the [*Martin-Baker*] presumption were applicable" because plaintiff "voiced h[er] concerns outside h[er] usual chain of command"). Thus, Evans has plausibly alleged that IAG had notice of her protected activity.

---

[3] IAG has again attached Evans's signed "Role Description" to its motion to dismiss. *See* Def.'s Mot. to Dismiss Pl.'s SAC Ex. A ("Ex. A"), ECF No. 15-1. The Court previously considered this document because Evans's Complaint "describe[d] her job duties . . . , they [were] integral to her claim, and she d[id] not contest the authenticity of the Role Description document." *See* Mem. Op. at 2 n.2 (citing *Langeman*, 88 F.4th at 292). That document describes Evans's job duties as including "ensur[ing] that necessary documentation is provided to ensure that service authorizations for nursing services . . . are current," "[a]ssisting in the training and promotion of nursing . . . and other staff members," "[e]nsuring that the nursing staff and IAG comply with the federal rules, regulations, and codes," and working "with the Human Resources Coordinator and the IAG corporate office to ensure that licenses are up to date." Ex. A at 3. In this round of briefing, Evans disputes that her operative Complaint incorporates the Role Description document and characterizes it as "inaccurate[]." *See* Pl.'s Opp'n at 15–16. Evans even amended her Complaint to remove her previous allegation that her job duties included "maintaining compliance of various mandatory training for the organization." *See* SAC Redline ¶ 12, ECF No. 14-1. Assuming that the *Martin-Baker* presumption applies because Evans's role involved some degree of compliance review, Evans has nevertheless stated a plausible claim. Accordingly, the Court need not decide whether it could consider the Role Description document when resolving this Rule 12(b)(6) motion.

Evans's amendments to her Complaint address many of the deficiencies analyzed by the Court in its prior Memorandum Opinion. *See* Mem. Op. at 11–13. Specifically, Evans now alleges that she raised concerns of backdating and its connection to the receipt of federal funding with her supervisors. *See* SAC ¶ 27. Like the plaintiff in *Singletary* who told her superiors that "the continuing failure to remedy the situation violated funding requirements," Evans alleges that she told Nyan that IAG was out of compliance with the "terms and conditions under which it was receiving federal funds." *See Singletary*, 939 F.3d at 300; SAC ¶ 27. At that point, Evans's superiors had notice that her backdating concerns related to potential fraud as to federal funding.

Moreover, Evans went beyond her usual chain of command—and "over" the heads of her direct supervisors—by complaining to Satcher, the Human Resources coordinator, on multiple occasions. *See* SAC ¶¶ 25–26; *Martin-Baker*, 389 F.3d at 1261; *Singletary*, 939 F.3d at 301. Around December 2022 and January 2023, Evans raised her concerns about compliance and backdating to Satcher. *See* SAC ¶¶ 25–26. Evans alleges that she viewed this action as an escalation because "she was going over Mr. Olatuyi and Ms. Nyan." *Id.* ¶ 26. That escalation is also consistent with Evans's allegation that she raised her concerns about backdating to a DDS nurse. *Id.* ¶ 27. After a January 2023 meeting at which a DDS coordinator "scolded the IAG team for not sending . . . documentation to sign in 'real time,'" Evans again raised her concerns regarding faulty documentation practices to Satcher "in hope[s] that she [could] arrange a meeting with Dr. Nelson, and the Executive Director, Dr. Charlene Bennett." *Id.* ¶ 29. Evans further alleges that she raised "her concerns that proper standards were not being adhered to . . . with regards to backdating" with Satcher yet again on February 3, 2023. *Id.* ¶ 34. And although Evans was unsuccessful in arranging a meeting with Executive Director Bennett, the Court infers that her purpose for attempting to contact Bennett on February 6, 2023, was to personally notify

10

the Executive Director about the backdating, which she had tried to do through her supervisor and Human Resources previously.  *See id.* ¶¶ 31, 34, 36.  These attempts to report outside her usual chain of command were beyond the scope of her regular duties and would have put IAG on notice of Evans's protected activity.

IAG faults Evans for failing to allege that she "told Ms. Satcher her concerns about backdating were related to receipt of federal funds."  Reply at 8, ECF No. 22.  Though Evans could have made this allegation expressly, IAG demands too much.  Drawing reasonable inferences from the facts alleged, the Court infers that the "concerns" regarding "faulty documentation practices" that Evans raised with Satcher in Human Resources were the same backdating and compliance concerns she had raised with Nyan previously.  *See* SAC ¶¶ 27, 29; *Langeman*, 88 F.4th at 294.  As discussed above, Evans alleges that she told Nyan "that IAG was not in compliance with terms and conditions under which it was receiving federal funds from DDS contracts, and ultimately receiving funds from Medicare and Medicaid."  SAC ¶ 27.  Evans then alleges that she "wanted to set up a meeting to discuss her concerns in detail with Dr. Nelson and loop in Dr. Bennett."  *Id.*  The next time the Complaint mentions Executive Director Bennett is two paragraphs later, when Evans alleges that her "suspicions of faulty documentation practices were confirmed," and that she "raised her concerns again to Sheri Satcher from Human Resources in hope[s] that she c[ould] arrange a meeting with Dr. Nelson, and the Executive Director, Dr. Charlene Bennett."  *Id.* ¶ 29.  In this context, the Court has little trouble inferring that Evans raised the same concerns with backdating—and the implications for federal funding—to Satcher.  And doing so outside her usual chain of command rebuts the presumption that she was merely fulfilling her job obligations.  *See Schweizer*, 677 F.3d at 1239–

40. Assuming that is all true, IAG had notice of Evans's protected activity. Accordingly, the Court will deny IAG's motion to dismiss on this basis.[4]

### V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 15) is **DENIED**; and Plaintiff's Rule 56(d) Motion (ECF No. 18) is **DENIED as moot**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 7, 2026                                          RUDOLPH CONTRERAS
                                                                            United States District Judge

---

[4] Because the Court denies IAG's motion to dismiss, it will also deny as moot Evans's motion for discovery pursuant to Rule 56(d). *See SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 110 (D.D.C. 2015); *Edelman v. Holder*, No. 08-cv-1767, 2010 WL 11668193, at *2 (D.D.C. Jan. 29, 2010).